IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 10, 2026 Session

## STATE OF TENNESSEE v. MARTINEZ OBRIEN CARTER

**Appeal from the Circuit Court for Maury County**
**Nos. 29835, 30431   Russell Parkes, Judge**

_____

### No. M2024-01817-CCA-R3-CD

_____

The Defendant, Martinez Obrien Carter, was convicted in the Maury County Circuit Court of selling heroin, a Class B felony; selling fentanyl, a Class C felony; and casual exchange of fentanyl, a Class A misdemeanor. After a sentencing hearing, the trial court sentenced him as a Range III, persistent offender to concurrent sentences of twenty-five years; twelve and one-half years; and eleven months, twenty-nine days, respectively. On appeal, the Defendant claims that (1) potential jurors were exposed to prejudicial extraneous information regarding his custodial status, (2) the State committed prosecutorial misconduct during its cross-examination of a defense witness, (3) the trial court improperly limited defense counsel's impeachment of the State's confidential informant; and (4) the verdicts are against the weight of the evidence. Based upon the oral arguments and our review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and TOM GREENHOLTZ, JJ., joined.

Mark E. Chapman, Nashville, Tennessee, for the appellant, Martinez Obrien Carter.

Jonathan Skrmetti, Attorney General and Reporter; Thomas C. Archibald, Assistant Attorney General; Brent Cooper, District Attorney General; and Ross Boudreaux, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In August 2022, the Maury County Grand Jury returned a three-count indictment, charging the Defendant with selling heroin on July 15, 2021; selling fentanyl on July 15, 2021; and selling fentanyl on July 29, 2021. The Defendant went to trial in February 2024.

The proof at trial showed that on July 13, 2021, a female confidential informant ("CI") participated in an undercover drug buy from Paul Bledsoe. After the drug buy, the CI approached Jeff Wray, an investigator for the Maury County Sheriff's Department ("MCSD") Narcotics Unit, and told him that the Defendant also was selling heroin. Based on the CI's information, Investigator Wray set up two undercover drug buys with the Defendant as the target. Officers from the Narcotics Unit and agents from the Tennessee Bureau of Investigation ("TBI") and the Twenty-Second Judicial District Drug Task Force assisted Investigator Wray with the drug buys.

Investigator Wray testified that on July 15, 2021, he met with the CI at a predetermined location. Officers searched the CI's vehicle for contraband and money, and a female deputy searched the CI. An agent equipped the CI with a recording device that allowed officers to see and hear the drug buy as it occurred. Investigator Wray gave the CI one hundred sixty dollars to buy one gram of heroin, known as a "G," from the Defendant. The CI telephoned the Defendant and agreed to meet him on Oak Park Drive, which was a dead-end road.

Investigator Wray testified that law enforcement followed the CI at a safe distance to Oak Park Drive. Law enforcement officers could not follow her to the exact meeting location but were able to watch her movements via the video equipment. The CI got out of her vehicle and walked to a car, where the Defendant was sitting in the driver's seat. Marijuana and a set of scales were visible in the car, and two handguns were visible on the Defendant's lap. The CI handed the money to the Defendant, and the Defendant handed a plastic baggie containing a substance consistent with heroin to the CI. The CI put the baggie into her purse and returned to her vehicle. She put the baggie into her center console, and agents followed her to a predetermined location. Law enforcement searched her and her vehicle again, and Investigator Wray obtained the substance she had purchased.

Investigator Wray testified that on July 29, 2021, he again met with the CI at a predetermined location. Officers searched her and her vehicle, and Investigator Wray gave her one hundred sixty dollars to buy one gram of heroin from the Defendant. The CI telephoned the Defendant and agreed to meet him at a trailer in Woodland Trailer Park on Lewis Street. The CI drove to the trailer, went into the kitchen area, and purchased a baggie containing an off-white powder from the Defendant.

Investigator Wray testified that he paid the CI two hundred dollars per drug buy for her participation and that their agreement included her testifying against the Defendant. He said he never saw Mr. Bledsoe on July 15 or July 29, 2021.

On cross-examination, Investigator Wray testified that he did not know if the telephone number the CI used to call the Defendant was the Defendant's telephone number and that he did not test any baggies for fingerprints. Investigator Wray acknowledged that Mr. Bledsoe was the CI's heroin and fentanyl supplier and that Mr. Bledsoe was another target of the Narcotics Unit. During the drug buy on July 13, the CI was supposed to buy one gram of heroin from Mr. Bledsoe. The CI bought one-half gram of heroin from Mr. Bledsoe but had to buy the other one-half gram of heroin from the Defendant.

Defense counsel asked Investigator Wray, "Has [the CI] told you that [the Defendant] was a weed man? Her weed man?" Investigator Wray responded, "I believe she told us he was a heroin dealer." Defense counsel repeated, "Has she told you that he was her weed man?" Investigator Wray answered, "No." He acknowledged, though, that a plate of marijuana was on the center console of the Defendant's car during the July 15 drug buy. The CI did not receive any marijuana from the Defendant.

Investigator Wray testified that the CI worked for another agent one or two times before she worked for Investigator Wray. He said he thought the CI was a drug user and acknowledged that she spent time in jail after her drug buys in this case. She also was charged with and convicted of introducing drugs into a penal institution. Investigator Wray said he did not promise the CI anything in exchange for her testimony against the Defendant.

On redirect-examination, Investigator Wray acknowledged that he lost contact with the CI during the July 13 drug buy involving Mr. Bledsoe. He explained that law enforcement officers did not see her leave the location of the drug buy due to an equipment failure but that they located her later that afternoon.

Crystal Carranza testified that she was the CI in this case.[1] In April 2021, Ms. Carranza found the father of her unborn child deceased from a drug overdose. As a result of that traumatic event, Ms. Carranza immediately "relapsed and overdosed and almost died." In July 2021, she began working as a CI for Investigator Wray. The State asked why she decided to work as a CI, and she said she was angry about the death of her child's father. She stated, "I was mad at the drugs. I was mad at myself. I was mad at drug

---

[1] The record reflects that at the time of trial, Ms. Carranza's legal name was Crystal Alexander. However, she said she preferred to be called by her previous name, Crystal Carranza. Therefore, we will refer to her as "Ms. Carranza."

dealers, and it was kind of, like, [a] revengeful thing." The State asked what she meant by "revengeful thing," and she said, "I wanted off drugs and drugs off the streets. I was mad at the people that sold my baby daddy drugs, because we were clean."

Ms. Carranza testified that at the time of the drug buys in this case, she had prior convictions of possession of heroin and methamphetamine for resale; aggravated burglary and misdemeanor theft; simple possession of heroin, cocaine, and hydrocodone; aggravated criminal trespass; and driving under the influence ("DUI"). In August 2020, she participated in an undercover drug buy involving a defendant named Joshua Gabehart. Ms. Carranza testified against Mr. Gabehart in September 2022. She said that to her knowledge, she had never received any favorable treatment in her criminal cases for her undercover work with law enforcement or for her testimony against Mr. Gabehart or the Defendant. She acknowledged that she was on probation and that she was scheduled for a probation hearing.

Ms. Carranza testified that she knew the Defendant "[t]hrough a mutual associate." On July 15, 2021, Ms. Carranza went to a predetermined location and met with law enforcement to conduct a controlled drug buy from the Defendant. The police searched her and her vehicle, equipped her with audio- and video-recording devices, and gave her one hundred sixty dollars to purchase heroin. Ms. Carranza said that she telephoned the Defendant to set up the drug buy and that she knew the telephone number she dialed to be the Defendant's telephone number. She met with the Defendant and bought heroin from him. After the drug buy, the police searched her and her vehicle and took possession of the drugs. The State played an audio recording of Ms. Carranza's telephone call to the Defendant and played a video recording of the drug buy. Ms. Carranza identified the Defendant's voice on the audio recording, and she identified the Defendant in the courtroom as the person from whom she purchased heroin on July 15, 2021.

Ms. Carranza testified that she and law enforcement repeated the process on July 29, 2021: the police searched her, equipped her with audio and video equipment, and gave her one hundred sixty dollars to buy heroin from the Defendant. She telephoned him with the same telephone number she had called on July 15, and he gave her an address in Woodland Trailer Park. Ms. Carranza drove to the address and went into the trailer. She said the Defendant was there with a male "associate," who was not Mr. Bledsoe. Ms. Carranza handed the cash to the Defendant, and the Defendant handed the heroin to Ms. Carranza. After the drug buy, Ms. Carranza drove to a predetermined location and gave the drugs to the police. The State played a video recording in which Ms. Carranza could be heard on the telephone arranging the drug buy with the Defendant and could be seen buying drugs from him inside the trailer.

Ms. Carranza acknowledged that she went to jail on April 6, 2022. She took drugs into the jail and was charged with introducing contraband into a penal institution. She made bond in March 2023, entered a three-month rehabilitation program at Mending Hearts, and successfully completed the program. In December 2023, she was convicted of introducing contraband into a penal institution.

On cross-examination, Ms. Carranza testified that her drug overdose in April 2021 was not her first drug overdose. She said she did not "recall all [of her] overdoses" but that she had overdosed more than two times. She clarified that when she said she met the Defendant "through a mutual associate," she meant Mr. Bledsoe. Mr. Bledsoe used to date Ms. Carranza's cousin, and Mr. Bledsoe sold fentanyl and heroin to Ms. Carranza. Ms. Carranza said that she and Mr. Bledsoe were friends and that they did not have a sexual relationship. After the death of her child's father, Ms. Carranza wanted to change her life and participated in undercover drug buys from Mr. Bledsoe. She estimated that she participated in three drug buys from him and acknowledged that those drug buys resulted in Mr. Bledsoe going to prison.

Ms. Carranza testified that police officers searched her before her undercover drug buys from the Defendant but that they did not search her body cavities. A female officer searched Ms. Carranza before the July 15 drug buy. During the search, the officer pulled Ms. Carranza's bra away from her body and shook her bra. Ms. Carranza said she never smoked marijuana with the Defendant. Defense counsel asked, "He wasn't the weed man?" Ms. Carranza answered, "Not for me, sir. I was never a pothead. It's not my drug of choice." She said, though, that she was "sure" the Defendant sold marijuana because she saw marijuana in his car on July 15.

Ms. Carranza acknowledged that she was paid two hundred dollars per drug buy and that Investigator Wray told her that she might have to testify against the Defendant. She said she participated in the drug buys because she had children and needed the money. After the drug buys, Ms. Carranza ended up going to jail and ended up being charged with and convicted of introducing contraband into a penal institution. She said she never overdosed on drugs while in jail.

Ms. Carranza acknowledged saying on direct examination that she wanted "revenge" on drug dealers after the death of her baby's father. She explained, "'Revenge' wasn't the best word. I'm very nervous up here, but [I was] angry at the whole addiction life, yes, sir." She said she was not angry with the Defendant when she bought drugs from him in July 2021. She said that after the drug buys, she changed her life and "cut off old ties with people that [she] used to run with," moved to a new location, and started college to obtain an associate's degree in paralegal studies.

Deputy Rebecca Orlow of the MCSO testified that she assisted with the undercover drug buy on July 15, 2021. Her role was to search Ms. Carranza before and after the drug buy, and she conducted "a full frisk above the clothing." She also helped another agent search Ms. Carranza's vehicle before and after the drug buy. Deputy Orlow did not find any contraband.

On cross-examination, Deputy Orlow testified that she did not remember what clothing Ms. Carranza was wearing on July 15. She searched Ms. Carranza by sliding her hands up Ms. Carranza's legs and into Ms. Carranza's crotch area. She said that she searched below Ms. Carranza's bra line and breasts, over Ms. Carranza's clothes, and that she "did not pull the bra out." Per police policy, Deputy Orlow was not allowed to search under Ms. Carranza's clothes. She said it was possible she did not find contraband hidden in the vaginal area of Ms. Carranza's clothing.

On redirect-examination, Deputy Orlow acknowledged that the purpose of her search was to find contraband hidden outside of Ms. Carranza's body but concealed by Ms. Carranza's clothing. In addition to sliding her hands along Ms. Carranza's legs, she searched Ms. Carranza's pockets, sock area, and crotch area.

TBI Agent Brett Trotter, an expert in forensic science, testified that he analyzed the substances obtained by Investigator Wray on July 15 and July 29, 2021. The substance collected on July 15 weighed .74 grams and was a mixture of heroin and fentanyl. The substance collected on July 29, weighed .74 grams and was fentanyl.

Agent Jeff Mathis of the Twenty-Second Judicial District Drug Task Force testified that he helped conduct surveillance of the drug buy on July 15, 2021. He also helped search the CI's vehicle for money, drugs, and weapons before the buy. A female deputy was present and helped him search the vehicle. After the vehicle search, Agent Mathis was one of the officers who followed CI to Oak Park Drive. He saw the CI turn onto Oak Park Drive, so he pulled over and waited for her to buy drugs from the Defendant. He then followed the CI to a predetermined location and helped another agent search the CI's vehicle.

Officer Joey Parks of the MCSD's Narcotics Unit testified that he helped Agent Mathis search the CI's vehicle after the drug buy on July 15, 2021. They did not find any contraband.

Agent Charlie Mosley of the TBI testified that he provided the money and video-surveillance equipment for the drug buys on July 15 and July 29, 2021, and that he monitored the transactions from his vehicle. On cross-examination, Agent Mosley acknowledged that "weed" could be seen in the Defendant's car on July 15.

- 6 -

Officers Brian Cook and Chris Bishop of the MCSD's Narcotics Unit testified that they assisted with the undercover drug operation on July 29, 2021, by searching the CI's vehicle before and after the drug buy. Officer Cook searched half of the vehicle, and Officer Bishop searched the other half of the vehicle. They did not find any contraband. Officer Bishop acknowledged that he and Officer Cook watched a "live feed" of the drug transaction as it occurred.

Agent Bill Doelle, the Director of the Twenty-Second Judicial District Drug Task Force, testified that he conducted surveillance for the drug buys on July 15 and July 29, 2021. On July 15, Agent Doelle and Agent Mathis were in an unmarked police car and followed the CI to and from Oak Park Drive. The agents did not follow the CI onto Oak Park Drive but waited nearby while she conducted the drug transaction with the Defendant. Similarly, on July 29, Agent Doelle and Agent Mathis followed the CI to and from Woodland Trailer Park. They did not follow the CI into the trailer park. Agent Doelle and Agent Mathis only lost sight of the CI while she was buying drugs from the Defendant. At the conclusion of Agent Doelle's testimony, the State rested its case.

Paul Bledsoe testified that he had known Crystal Carranza, the CI in this case, about fifteen years because he used to date her cousin. Mr. Bledsoe and Ms. Carranza had a sexual relationship, and Mr. Bledsoe sold fentanyl, heroin, and marijuana to her. Mr. Bledsoe knew the Defendant to sell marijuana, and Mr. Bledsoe bought marijuana from him. Mr. Bledsoe said that he did not know the Defendant to sell heroin or fentanyl and that he would have known if the Defendant was selling those drugs because the Defendant would have been Mr. Bledsoe's competition. Mr. Bledsoe said he did not know why Ms. Carranza lied about their sexual relationship but that he knew her to lie and steal.

On cross-examination, Mr. Bledsoe testified that he sold drugs to Ms. Carranza in 2021 but that he did not know the dates of those drug sales. Therefore, he could not say he sold drugs to her on July 15 or July 29, 2021. However, Ms. Carranza was responsible for Bledsoe's being convicted of selling drugs.

Mr. Bledsoe testified that he was transported from prison to the Defendant's trial on the same bus as the Defendant but that he did not talk with anyone about the Defendant's trial. Mr. Bledsoe acknowledged having prior convictions for possessing marijuana with intent to sell in a drug-free school zone; several counts of selling marijuana in a drug-free school zone; possessing methamphetamine, cocaine, and fentanyl for resale; and being a felon in possession of a firearm. He acknowledged that he did not have "anything against" the Defendant.

On redirect-examination, Mr. Bledsoe testified that the State prosecuted him for selling drugs to Ms. Carranza while she was working as a CI. Mr. Bledsoe pled guilty to selling drugs to Ms. Carranza five times.

Lacy Owens testified that she was under subpoena and that she knew Ms. Carranza through the father of Ms. Carranza's baby. Ms. Owens also spent time in confinement with Ms. Carranza. Ms. Carranza told Ms. Owens that Ms. Carranza overdosed on drugs while in jail.

On cross-examination, Ms. Owens acknowledged having prior convictions for forgery. She said that she talked with the Defendant's attorney before the Defendant's trial but that they did not talk about the trial. Ms. Owens also did not talk with any witnesses about the Defendant's trial. She stated that she knew the Defendant and that "I know my friend doesn't do what he's been accused of. I've only ever seen him have weed." Ms. Owens stated that she thought Ms. Carranza "could be a better parent and person" but that Ms. Owens's testifying for the Defendant did not have anything to do with her feelings about Ms. Carranza.

At the conclusion of Ms. Owens's testimony, the defense rested its case. The jury found the Defendant guilty as charged in count one of selling heroin on July 15, a Class B felony, and in count three of selling fentanyl on July 29, a Class C felony. The jury found him guilty in count two of casual exchange of fentanyl on July 15, a Class A misdemeanor, as a lesser-included offense of selling fentanyl. After a sentencing hearing, the trial court sentenced the Defendant to concurrent sentences of twenty-five years for selling heroin; twelve years, six months for selling fentanyl; and eleven months, twenty-nine days for casual exchange.

## ANALYSIS

The Defendant claims that the trial court erred by denying his motion for new trial because (1) potential jurors were exposed to extraneous prejudicial information; (2) the State committed prosecutorial misconduct during its cross-examination of Mr. Bledsoe; (3) the trial court prohibited the defense from impeaching Ms. Carranza; and (4) the verdicts were against the weight of the evidence.[2] However, the Defendant's brief is inadequate. The facts section is less than two pages for twelve witnesses who testified over the span of three days. *See* Tenn. R. App. P. 27(a)(6). The argument section consists of one or two short paragraphs for each issue, and the Defendant has not cited any relevant or criminal case law to support his claims. *See* Tenn. R. App. P. 27(a)(7)(A). Due to the Defendant's

---

[2] The Defendant combined the second and third issues into a single issue. We have separated the issues for clarity.

failure to comply with Tennessee Rule of Appellate Procedure (27)(a), we could treat his issues as waived. However, we will address his issues briefly. *See State v. Potts*, No. M2020-01623-CCA-R3-CD, 2022 WL 2348233, at *22 (Tenn. Crim. App. June 29, 2022) ("When issues are not properly raised and developed in briefs, when the briefs are wholly inadequate to present specific issues for review, we will not engage in an exhaustive review of the merits thereof."), *perm. app. denied* (Tenn. Dec. 14, 2022).

## I. Extraneous Prejudicial Information

The Defendant contends that potential jurors were exposed to extraneous prejudicial information regarding his custodial status. The State argues that the Defendant failed to show the jury was exposed to extraneous prejudicial information. We agree with the State.

The record reflects that on the first day of trial, a prison bus transported the Defendant to court. However, the bus was late. Soon after 9:00 a.m., the trial court entered the courtroom, told the potential jurors that "there was a problem with transport," and asked them to return to the courtroom at 9:40 a.m.

The bus arrived by 10:00 a.m. The Defendant, who was wearing "his prison blues," was allowed to change into civilian clothes. While he was changing clothes, the court officer approached defense counsel in the courtroom and said, "'Your client is back in the jury room changing.'" Defense counsel subsequently moved for a mistrial, arguing that potential jurors could have surmised from the Defendant's late arrival and from the court officer's statement that the Defendant was in custody. Defense counsel requested a different trial date with a different jury.

The trial court held a brief hearing in which the court officer testified about making the statement to defense counsel. Defense counsel then called Tammy English, who had a child with the Defendant, to testify. Ms. English said she was sitting in the courtroom at the time of the court officer's statement and heard the court officer tell defense counsel that the Defendant was changing clothes. The trial court noted for the record that the distance from the court officer and defense counsel to any potential juror was sixty to eighty feet. The trial court denied the motion for a mistrial because the Defendant failed to show that any juror had been exposed to extraneous information that would indicate the Defendant was in custody.

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound

discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. *See State v. Hall*, 976 S.W.2d 121, 147 (Tenn. 1998) (citing *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990)). The burden of establishing the necessity for a mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to a trial by an impartial jury. "A defendant is entitled to have his 'guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *State v. Davidson*, 509 S.W.3d 156, 193 (Tenn. 2016) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)). "A party challenging the validity of a verdict must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *State v. Adams*, 405 S.W.3d 641, 651 (Tenn. 2013).

We conclude that the court officer's statement was not prejudicial. The court officer advised defense counsel that the Defendant was changing clothes. The officer did not say the Defendant was changing his prison clothes. In any event, there is no proof in the record that any potential jurors were affected by the statement. The record reflects that the trial court estimated the distance between the court officer and any potential juror to be sixty to eighty feet. The Defendant did not call any juror or prospective juror to establish that the statement was audible at that distance, did not request individual voir dire to probe whether any juror had heard it, and did not otherwise introduce proof that the statement carried across the courtroom. On this record, the trial court did not err by denying the motion for a mistrial.

## II. Prosecutorial Misconduct

Next, the Defendant claims that the State committed prosecutorial misconduct during its cross-examination of Mr. Bledsoe by asking if Mr. Bledsoe and the Defendant were transported to court on the same prison bus. The State argues that the Defendant is not entitled to relief on this issue. We agree with the State.

On cross-examination, Mr. Bledsoe acknowledged that he was in prison. The prosecutor asked if he was transported to the Defendant's trial by himself, and he answered, "No, sir. Bus full of people." The prosecutor stated, "Bus full of people. That included the [D]efendant; did it not?" Mr. Bledsoe responded, "Yes, sir." The prosecutor then asked, "So you were transported with [the Defendant]?" Mr. Bledsoe said, "No, sir. I was transported -- well, I guess. I'm in max. [T]hey got me in max. When I'm confined, I

don't leave the max area. I'm by myself." Before the prosecutor could ask the next question, the trial court stated, "Let me see the counsel in a side bar." The trial court, the prosecutor, and defense counsel had a discussion outside the hearing of the court reporter. When cross-examination resumed, the prosecutor did not ask Mr. Bledsoe any additional questions about being transported to court with the Defendant.

After the Defendant's witnesses testified, the trial court sent the jury out of the courtroom and stated as follows for the record:

> [T]he Court terminated the cross [of Mr. Bledsoe] and had a very brief conference at which time I advised [the prosecutor] to not go into any questions that would intimate that the [D]efendant was in any way incarcerated in TDOC or had been transported by TDOC.
>
> . . . .
>
> At that point counsel for the [D]efendant indicated there would be a motion for a mistrial. I told counsel at that point we would proceed with questioning the witness. [The prosecutor] didn't go any further on that issue, and I told [defense counsel] that he could make that motion the first time the jury went out.

Defense counsel requested a mistrial, asserting that the prosecutor deliberately alerted the jury to the Defendant's being incarcerated and that the Defendant was prejudiced by the questioning. Defense counsel said he was "ashamed" of the prosecutor and admonished the prosecutor, "Don't do it again[.]" The prosecutor acknowledged that his questions were improper but contended that manifest necessity did not warrant a mistrial because the Defendant's theory of the case was that he sold drugs, albeit marijuana, to Ms. Carranza on multiple occasions.

The trial court found that manifest necessity did not require a mistrial. The trial court noted that "[t]he Court on its own terminated the questioning not at the insistence of the defendant but because I found it to be most prudent to do so." The trial court offered to give the jury a limiting instruction, and the defense stated that it wanted the instruction. When the jury returned to the courtroom, the trial court instructed the jurors:

> [T]o the extent that any of you may have heard any testimony whether it be a question or an answer as it relates to anyone being incarcerated at this point, I am instructing that you are not to consider that in your deliberations and/or in reaching your decision. You may consider the judgments and convictions placed before you in evidence.

- 11 -

Otherwise, if someone is or is not incarcerated, that may not have bearing on your decision.

In order to prevail on a claim of prosecutorial misconduct, a defendant must show that the conduct committed by the prosecution was so inflammatory or improper that it affected the verdict to the defendant's detriment. *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965); *State v. Gray*, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). In making this determination, we consider five factors:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

> 2. The curative measures undertaken by the court and the prosecution.

> 3. The intent of the prosecutor in making the improper statement.

> 4. The cumulative effect of the improper conduct and any other errors in the record.

> 5. The relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see also State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984).

The prosecutor should not have asked questions that caused Mr. Bledsoe to reveal the Defendant was incarcerated. However, considering the *Judge* factors, the Defendant has not shown that the prosecutorial misconduct affected the outcome of the trial. The trial court, on its own initiative, promptly stopped the State's questioning and instructed the jury not to consider evidence of any witness being incarcerated. We generally presume that a jury has followed the trial court's instructions. *See State v. Butler*, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Moreover, the Defendant has not shown any other errors in the record, and, as we will discuss later in this opinion, the evidence against the Defendant was overwhelming. Therefore, we conclude that the Defendant is not entitled to relief on this issue.

### III. Impeachment

The Defendant claims that the trial court improperly prohibited him from impeaching Ms. Carranza's credibility. The State argues that the trial court did not err because the proposed testimony was irrelevant. We agree with the State.

On direct examination, Ms. Carranza acknowledged that she was in jail from April 6, 2022, to March 3, 2023, and that she was charged with and convicted of introducing contraband into a penal institution. On cross-examination, defense counsel began asking her about the conviction. The State objected, so the trial court sent the jury out of the courtroom. Upon questioning by defense counsel, Ms. Carranza said she entered the jail with contraband in her bra and hid the contraband in a bathroom trash can. She was not under the influence of drugs when she took contraband into the jail. Defense counsel indicated that he was not going to question Ms. Carranza about the circumstances of the conviction in front of the jury, and the jury returned to the courtroom.

Subsequently, defense counsel asked Ms. Carranza, "Now, who is Summer Anderson?" Ms. Carranza said Ms. Anderson was "a friend" and was "deceased." Defense counsel asked, "How did she die?" The State objected based on relevance, and the trial court held a bench conference in which defense counsel advised the trial court that he thought Ms. Anderson died in jail of a drug overdose. The trial court concluded that defense counsel was improperly "getting into" the underlying facts of Ms. Carranza's conviction for introducing contraband into a penal institution and sustained the State's objection. However, the trial court later allowed the Defendant to proffer Ms. Carranza's testimony outside the jury's presence.

During the proffer, Ms. Carranza testified that she took prescription methadone into the jail and that she "heard" Ms. Anderson died of a fentanyl or heroin overdose. Ms. Carranza denied "getting high" with Ms. Anderson or sharing drugs with Ms. Anderson while they were in custody together.

The Defendant claims that the trial court improperly excluded testimony regarding the death of Ms. Anderson and regarding the number of times Ms. Carranza overdosed while in jail, which severely prejudiced the defense's ability to impeach Ms. Carranza's credibility. He contends that he had a right to impeach her pursuant to Tennessee Rule of Evidence 607, which provides that "[t]he credibility of a witness may be attacked by any party." At oral arguments, the Defendant added that he should have been allowed to impeach Ms. Carranza under Tennessee Rule of Evidence 608(b)(1), which allows a party to attack a witness's credibility with specific instances of conduct if probative of that witness's character for truthfulness or untruthfulness, and that Ms. Carranza's not being charged with a crime in connection with Ms. Anderson's death gave Ms. Carranza "a massive motive" to lie for the State.

In order to be admissible, evidence must be relevant and probative to an issue at trial. *State v. McCary*, 922 S.W.2d 511, 515 (Tenn.1996); *see also* Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The determination of relevance is left to the discretion of the trial court, and this Court will not overturn a trial court's determination absent an abuse of discretion. *State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

Initially, the record does not support the Defendant's claim that the trial court prohibited him from questioning Ms. Carranza about the number of her drug overdoses. To the contrary, defense counsel asked Ms. Carranza about her overdoses, and she said she overdosed the day she found her baby's father deceased. She stated that she could not remember all of her overdoses but that she had overdosed more than twice. She denied overdosing while incarcerated. The Defendant has not cited any example in the transcript where the trial court prohibited him from asking Ms. Carranza about her drug overdoses. Therefore, we find no merit to this claim.

As to the Defendant's claim that the trial court improperly prohibited him from questioning Ms. Carranza about Ms. Anderson's death, defense counsel was allowed to proffer Ms. Carranza's testimony. Ms. Carranza stated that she was charged with introducing contraband into a penal institution because she took prescription methadone into the jail and hid it in a trash can. There is no evidence that Ms. Anderson's death from a fentanyl or heroin overdose occurred while she was in confinement with Ms. Carranza or that her death was in any way related to Ms. Carranza's conviction of introducing contraband into a penal institution. Accordingly, the trial court properly prohibited the Defendant from questioning Ms. Carranza about Ms. Anderson's death.

## IV. Sufficiency of the Evidence

Finally, the Defendant claims that the jury's verdicts are against the weight of the evidence. The State argues that the Defendant is not entitled to relief because the evidence against him is overwhelming. We agree with the State.

Tennessee Rule of Criminal Procedure 33(d) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." When weighing the evidence, the trial court views the evidence like a juror, including determining the credibility of witnesses. *State v. Ellis*, 453 S.W.3d 889, 899 (Tenn. 2015). "[A] judge exercising thirteenth juror function, like a juror, is not required to give any reason for the action." *State v. Dankworth*, 919 S.W.2d 52, 58 (Tenn. Crim. App. 1995).

After the jury announced its verdicts in this case, the trial court stated that it accepted the verdicts and set the case for a sentencing hearing. Therefore, the record reflects that

the trial court assessed the weight of the evidence and fulfilled its duty as the thirteenth juror.

To the extent the Defendant is arguing that the evidence is insufficient to support the convictions, when the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

Regarding counts one and three, Tennessee Code Annotated section 39-17-417(a)(3) provides that it is an offense for a defendant to knowingly sell a controlled substance. Regarding count two, it is an offense for a defendant to knowingly possess or casually exchange a controlled substance. Tenn. Code Ann. § 39-17-418(a). Heroin is a Schedule I controlled substance, and fentanyl is a Schedule II controlled substance. Tenn. Code Ann. §§ 39-17-406(c)(11), -408(c)(9).

Taken in the light most favorable to the State, the evidence shows that on July 15 and July 29, 2021, Ms. Carranza telephoned the Defendant and arranged to buy one gram of heroin from him. She agreed to meet him on Oak Park Drive on July 15 and at a trailer in Woodland Trailer Park on July 29. Before each buy, law enforcement officers searched her for money, drugs, and weapons and gave her one hundred sixty dollars to buy heroin.

- 15 -

They followed her to the meeting places, watched with video surveillance as the drug buys occurred, and then followed her to predetermined locations.  They collected the substances she bought from the Defendant and searched her again for money, drugs, and weapons.  Video recordings of the transactions showed the Defendant selling the substances to Ms. Carranza, and forensic analysis of the substances revealed them to be a mixture of heroin and fentanyl on July 15 and fentanyl on July 29.  Although the Defendant claims that Ms. Carranza was not credible, the jury did not have to accredit her testimony to find him guilty of the offenses.  The testimony of the State's other witnesses and the video recordings of the drug buys were overwhelming evidence of his guilt.  In any event, assuming the jurors accredited Ms. Carranza's testimony, determining her credibility was within the purview of the jury.  *See State v. Millsaps*, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "[t]he weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact").  Therefore, the evidence is sufficient to support the convictions.

## CONCLUSION

Upon our review of the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

s/ JOHN W. CAMPBELL
JOHN W. CAMPBELL, SR., JUDGE